Filed 7/31/14  In re C.C. CA4/2

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| In re C.C., a Person Coming Under the Juvenile Court Law. | |
| RIVERSIDE COUNTY CHILDREN AND FAMILY SERVICES, | E060499 |
| Plaintiff and Respondent, | (Super.Ct.No. RIJ114186) |
| v. | OPINION |
| C.A., | |
| Defendant and Appellant. | |

APPEAL from the Superior Court of Riverside County.  Jacqueline C. Jackson, Judge.  Affirmed.

Lori A. Fields, under appointment by the Court of Appeal, for Defendant and Appellant.

Pamela J. Walls, County Counsel, Julie Koons Jarvi, Deputy County Counsel, for Plaintiff and Respondent.

No appearance for Minor.

1

Defendant and appellant C.A. (Mother) appeals the termination of her parental rights under Welfare and Institutions Code section 366.26[1] as to her minor daughter C.C. (Minor), and the denial of her section 388 petition. Mother contends the juvenile court abused its discretion by not finding a change in circumstances sufficient to justify another attempt at family reunification and by not permitting her to prepare or present a bonding study before it entered a ruling. In addition, she asserts the court should have found compelling evidence the parental bond between Mother and Minor necessitated stopping the adoption process and instituting a legal guardianship. Because the juvenile court's rulings on the 388 petition and the bonding study were within its discretion, and because substantial evidence supports its decision not to apply the parental bond exception, we affirm.

## FACTUAL AND PROCEDURAL HISTORY

Minor was born in January 2011 after 36 weeks' gestation. She suffered from insufficient oxygen and growth restriction, so a 10-day response referral was upgraded to an immediate response referral the day after her birth by plaintiff and respondent Riverside County Department of Public Social Services (the Department). Mother reported she had no prenatal care because of transportation and financial issues; she smoked cigarettes during the pregnancy and suffered from hypertension. Mother admitted a history of methamphetamine use, but passed a toxicology screen.

---

[1] All further statutory references are to the Welfare and Institutions Code unless otherwise indicated.

2

Mother had a prior history with the Department. She had two other children, C.K. and C.V., were ages 8 and 13 at the time of the prior investigation. A petition had been filed in 2007 because Mother and the father of C.V. had failed to follow up on treatment recommendations for that child's cancer diagnosis. In addition, both children had been left in the care of a babysitter who had a history of engaging in domestic violence in front of the children. Mother, it was alleged, was abusing substances and out of the house for days at a stretch and the children were left to wander the neighborhood and search trash cans for food to eat. The petition was found true, and the children were removed from the home; Mother and the two fathers were offered reunification services.

In discussing that prior petition with the Department, Mother stated she lost custody of the children because of the domestic violence between the babysitter and the babysitter's boyfriend, but asserted the petition was an act of retaliation by the babysitter's boyfriend after Mother barred him from her home. She asserted she could have shown proof she took C.V. for treatment, but the Department would not listen to her. The reunification plan failed, she said, because she had an inventory job that required her to travel throughout California and that made it difficult to complete the plan. She stated she took a couple of urinalysis drug tests but was never able to produce a sufficient sample. Maternal grandmother was granted legal guardianship of C.V.; C.K. was adopted by maternal grandmother; Mother's parental rights were terminated.

A Department social worker met with Mother at Riverside County Regional Medical Center. Mother stated she had been arrested for identity theft in Washington in

2003, and as a result had to submit to weekly drug tests. She told the Department that she then quit using methamphetamine and never took it again. She stated she has never seen the baby's father, D.C. (Father) use drugs.[2] Father told the Department he had separate convictions for conspiracy and methamphetamine possession and had served a total of 5 years, 4 months. He stated he was not currently using drugs, but refused to take a drug test. Father's rap sheet disclosed more than three separate convictions, most drug-related. A social worker visited the home of Mother and Father (collectively, Parents) and found it appropriate to meet Minor's needs.

Minor's release from the hospital was delayed because Minor experienced difficulties while feeding. One of Mother's visits to Minor in the hospital raised concerns in the staff that she was "under the influence of something" because she was "loud and hyper." Prior to Minor's release from the hospital, the Department attempted to contact Mother multiple times beginning on February 8; Mother did not contact the Department until February 22. On March 4 the social worker went to the home to inquire why Mother had not drug tested. She was met by Father, who would not let her see Mother and who told her Mother did go to the clinic but was turned away because there was no referral for testing. The social worker advised Father that he and Mother would have to go and be tested that same day; she telephoned the clinic to confirm it had the received the referral. On March 5 the social worker called the clinic; Parents had not appeared for drug testing the previous day.

---

[2] Father is not a party to this appeal.

4

A dependency hearing was held on March 9; the court ordered Parents to submit to drug testing. Minor was removed from the home and placed in a foster home on March 21, following Parents' positive test for amphetamines on March 14. Parents told the social worker it may have been a false positive caused by their taking Vicodin, but were unable to show a prescription for Vicodin. At a hearing on March 24 the juvenile court ordered Minor continue to be removed from Parents custody; reunification services were ordered. Mother persisted in claiming the test was a false positive, telling the social worker she last used methamphetamine in 2006. The positive test result for methamphetamine and amphetamines was affirmed by a hair follicle test taken on March 25. Mother had subsequent negative drug tests on March 29 and April 1, but then failed to show for the next six drug testing dates in April.

Reunification services and out-of-home placement were continued following a jurisdictional hearing on May 17. On September 29, Minor was placed with Mother on family maintenance at an inpatient drug program following a Department team decision meeting. Mother participated in an inpatient drug program, drug testing, parenting education, counseling, and thrice-weekly Narcotics Anonymous meetings. It was unknown if Father participated in his services. Mother told the social worker she was "learning how to cope with addiction."

A status review hearing was held on November 21, 2011. The court found that mother was making satisfactory progress and continued the provision of services. Mother's string of clean drug tests results was interrupted by a positive test on April 16, 2012, which she stated was a false positive caused by her use of Sertraline, a prescribed

5

drug. She had a clean test result on a sample taken two days later. As part of the social worker's status review report of May 22, Mother submitted certificates of completion from her inpatient drug programs, anger management course, domestic violence course, self-esteem course, and parenting course, as well as proof of enrollment in a comprehensive "MOMS" substance abuse program offered by the Riverside County Department of Mental Health. On June 19, the court ordered continuation of family maintenance. On June 20, Mother was a no-show for an on-demand drug test. She had moved to a new sober living home so had stopped attending her drug program, but promised to begin one within the week.

Mother contacted her social worker on August 6 to tell her she would no longer be residing at her sober living home. Thereafter Mother was unreachable by her social worker. The social worker contacted Mother's welfare worker, who told her Mother needed to redo her paperwork or her payments would be terminated. Mother did not show for the appointment with her welfare worker and her payments were stopped. The Department requested a protective custody warrant for Minor, which was issued on September 4. A section 364 family maintenance review hearing was set for December 19; the Department's report filed December 5 indicated that no contact had been received from Mother since August 6.

Mother attended the family maintenance review hearing on December 19. The hearing was continued to January 23, 2013, to allow the Department to update its information about Mother; Motion was ordered to submit to a hair follicle drug test. Mother met with a Department social worker after the hearing and said she had been

6

living with a friend, but did not inform the Department because the landlord would have been upset if he learned she was living there. She stated she was attending Alcoholics Anonymous (AA) meetings and living with her sponsor. Mother thought that the Department had suspended her welfare payments and wanted her to appear so they could take Minor. Mother was going to enroll in a MOMS program. She denied that she had been using drugs. The Department set up a hair follicle drug test for Mother, but she did not take the test. Mother failed an on-demand drug test she took on December 19, testing positive for methamphetamine.

Mother got her welfare benefits restored, but again became unreachable. She called the Department on January 7, 2013, and said she still intended to take the hair follicle drug test; she verified she was living with her AA sponsor. Mother also said she would be enrolling in a MOMS program that week. Mother's AA sponsor told the social worker on January 8 that she had not seem Mother since December 19 and that Mother was no longer residing with her. On January 23, the Department's oral motion to detain Minor was granted by the dependency court.

A section 387 removal petition was filed on January 25, 2013. Mother took a hair follicle test on January 25 and tested positive for methamphetamine and amphetamine. She was enrolled in random drug testing and subsequently tested negative on February 7.

A contested section 387 jurisdictional hearing and section 364 family maintenance hearing were held on March 12. At the hearing, the social worker stated that there was "an attachment" between Minor and Mother, but noted Minor did not cry

7

or get upset when detained; and Minor does not cry after her visits with Mother. The social worker reported Mother admitted she lied when she denied relapsing into drug use. Mother's counsel noted that Mother had no positive test results from February 7. Mother testified at the hearing. She told the court she was due to graduate the following day from a 45-day drug relapse prevention class. She was committed to another six months of follow-up programs. Mother had been seeing Minor for one hour per week and was willing to comply with any orders the court might set regarding counseling, drug testing, and contact with Father.

The court terminated Mother's reunification services and set a section 366.26 selection and implementation hearing for Minor's ultimate placement. Responding to Mother's counsel's statement that the "light has gone on" for Mother to recognize the changes she needed to make in her life, the court stated it was "concerned about the light staying on." The court noted, "the cyclical process that mom goes through" in falling back into drug use was one "the baby has to walk through as well." While Mother's current progress was a "great" thing, it was only "a good beginning." Mother had exceeded her statutory time limit for reunification services, so the court ordered them terminated.

Mother appealed that decision here, seeking an extraordinary writ. By opinion filed June 12, 2013, we found there was sufficient evidence to support the court's finding that returning Minor to Mother's custody would create a substantial risk of harm to Minor. (*C.A. v. Superior Court* (June 12, 2013, E058284) [nonpub. opn.].) Further proceedings were briefly abeyed while the Department investigated the possibility of

8

having a maternal aunt adopt Minor, but the placement was not possible. On July 1, 2013, Mother filed a request under section 388 to alter the court's order due to her change of circumstances, seeking to have services restarted to enable Minor to transition back into Mother's custody. Mother asserted she had done an "exemplary" job of addressing her addiction issues. She attached to her petition letters of reference from her sober living home, a service provider, and her drug counselor. In addition, she included certificates of completion from a 90-day drug program, an anger management program, a parenting education course, and a self-esteem course. She also included sign-in cards from Narcotics Anonymous meetings. The section 388 petition was set for hearing on July 10 with the continued 366.26 selection and implementation hearing; both were subsequently continued to January 13, 2014. The postpermanency section 366.3 hearing was held on July 10, and adoption was ordered as the permanent plan.

During the pendency of the hearings, further addendum reports were filed by the Department. One filed in September reported that Mother completed 12 weeks of addiction therapy aftercare, had passed eight random drug tests, and was participating in weekly 12-step meetings. In addition, Mother planned to enroll in the Fall semester at San Bernardino Valley College. She was having two-hour weekly visits with Minor without issues.

The October addendum report noted Minor had been matched and placed with a prospective adoptive family on October 8. For that reason, the Department recommended reducing Mother's visits to once per month to facilitate the adoption. The report stated Mother was doing well and making positive life changes, but the

9

Department believed her lengthy history of drug use required her to focus on herself to overcome her addictions.

An update of Mother's progress was filed on November 7. Included were updated and additional letters of reference, additional reports of negative tests for drugs and alcohol, and a high school equivalency diploma.

Two addendum reports were filed in December. The first, filed on December 11, introduced information about the adoptive family that had been found for Minor. It reported Minor was comfortable and thriving in the home and was bonding appropriately. The social worker also reported she supervised part of Mother's visit with Minor and noted Minor "grabbed on" to the adoptive father and turned away from Mother when she arrived. "Adoptions" monitored the remainder of the visit, and told the Department that Minor "just wave[d] goodbye and leaves" when Mother's visit is over. The report also noted Mother was timely in her visits, and was now employed full time while attending college. The confidential assessment reported that the adoptive parents did not want to maintain face-to-face contact between Minor and Mother, and would only accept cards, letters, and photographs through the Department. The second addendum report, filed December 23, updated Minor's progress as to developmental milestones. It also noted that it "takes a moment for [Minor] to warm up to mom" at the start of the visits and that Minor "appears to be more upset when the prospective adoptive father leaves the visit room" than when Minor leaves Mother at the end of the visit.

The Department's final recommendation to the court on reunifying Mother with Minor was summarized in the addendum report: "[Minor] was detained from her mother at roughly 7 weeks old, only to be returned to her mother. [T]he mother relapsed, abscond[ed] with the child while continuing to abuse controlled substances and then shows up to the court hearing on December 19, 2012, stating she is not using controlled substances and is stable. The hair follicle test thus proved the mother had continued to abuse controlled substances with [Minor] in her care and an open dependency. The mother lied to the Court and the Department and is a flight risk if [Minor] would ever be left alone [with her] again. As of December 2013, [Minor] has lived in her mother[']s care 18 months out of her 36 months of age. The most recent 12 months she has been in foster care, and sees [Mother] for very limited time. [Mother] has not had the responsibility of caring for her last three children, and when the Department and Court entrusted her to care for her third child, [Minor], she relapsed and absconded with [t]he baby. [Mother] has a proven record of not being able to stay sober while caring for her children."

The contact log reported from Mother's visit with Minor on December 12 that "[s]he does refer to mom as 'mom' and when she got the comb stuck she said 'oops mommy.' At one point the foster father walked out of the room to get a drink and [Minor] wanted to go with him."

Another update on Mother's progress was filed on December 17, consisting of a new reference letter from Hailey's Home Sober Living and five additional clean drug tests administered by Hailey's Home.

11

The court held the combined section 366.26, 366.3, and 388 hearing on January 13, 2014. The social worker testified Mother and Minor were bonded, but that Minor was more strongly bonded to the prospective adoptive parents. She stated it was the Department's policy that a foster or prospective adoptive parent monitor visits between the birth parent and the detained child. She conceded Mother's circumstances have changed since Minor was detained. She did not believe it would be in Minor's best interest to extend further reunification services to Mother; Mother had shown she can only maintain stability for a while and Minor deserved a permanent, stable home. The social worker noted Mother had never maintained sobriety while living outside of a sober living environment. The social worker described Minor's affect regarding Mother as "a little bit distant, not as a caretaker but as a—like a friend or another, you know, acquaintance." In contrast, she stated Minor looks to the adoptive parents as her primary caretakers, is agitated when they leave, and refers to them as "mom and dad."

Mother testified at the hearing. She noted she was subject to random drug testing through her employment, but stated her current sobriety is "pretty strong, very strong." She apologized to the social worker and the court for lying about her previous drug use. She told the court she was now serious about her sobriety and was taking college courses to become a drug counselor or marriage and family therapist.

Mother stated she felt it was unfair that the prospective adoptive father got to be present at her visits with Minor. She testified he would say things that made her feel bad. She worked out with him a way to end her visits that would not get Minor upset and be "as easy as possible for her." The social worker was only present at "a couple"

12

of her visits with Minor and was only present for "[a]bout 20 minutes" of the visit on December 12.

Mother testified that "this time is different" "[b]ecause I have never tried to change my life as much as I have in the last year." She "actually can't imagine changing that path because it feels too good."

The court noted it has "been a six-year journey, and like I said, mom is doing very well, but mom has been here before with the older children, and then we went back with [Minor]. So that's a concern." Mother's counsel offered to pay for a bonding study to demonstrate that extending services would be in Minor's best interest. The court noted Minor called the adoptive parents "mom" and "dad," as well as calling Mother "mom." It discounted the importance of the use of those terms because of Minor's age. The court recognized Mother's visitation with Minor had gone well.

The Department and Minor argued against delaying the adoption for a bonding study, noting the offer was made late in the process, there had been little evidence of bonding on Minor's part, and a bonding study was unlikely to be probative given Minor's youth. The court noted it did not see a connection between Minor and Mother from the reports of their visits. Given Mother's 10-year battle with addiction, the court noted that Minor had "essentially been with the court her entire life." The court agreed the "lights" may have come on for Mother, but "in time frames such as juvenile, that's a very short period of time where that light switch is able to be flickered and followed through on. And sometimes it comes on a little too late, unfortunately, which I think might be the case here." The court denied the section 388 petition. Regarding the

section 366.26 issue, the court stated it was a "more difficult decision." The court noted, "[Mother] has done quite well. It's just unfortunate we don't have the luxury of time to go out as far as at least this court would need to go out to be comfortable not giving [Minor] a permanent plan today." The court terminated parental rights under section 366.26.

## DISCUSSION

Mother charges that the court abused its discretion by declining to find a change of circumstances, and by not deferring ruling until she could prepare and submit a bonding study. Given the evidence before it, the court acted within the bounds of its discretion. Mother also charges there was insufficient evidence to justify ordering adoption for Minor because the benefits of adoption were outweighed by the benefits of reunifying her with Mother. We disagree, finding the ruling proper.

### A.    THE 388 PETITION:  CHANGE OF CIRCUMSTANCES

Section 388 provides that the juvenile court may, in its discretion, modify a prior order on the request of any interested person, if the court finds both (1) new evidence or a material change in circumstances justifying modification of the order, and (2) that the requested modification would be in the child's best interests. (§ 388, subd. (a).) Accordingly, Mother had the burden to show by a preponderance of the evidence that there was new evidence or there were changed circumstances that make modification of a prior order in the best interests of the child. (*In re Stephanie M*. (1994) 7 Cal.4th 295, 317.)

14

When a party having the burden of proof on an issue challenges a finding that reflects the trier of fact's rejection of that party's evidence, "the question for a reviewing court becomes whether the evidence compels a finding in favor of the appellant as a matter of law. [Citations.] Specifically, the question becomes whether the appellant's evidence was (1) 'uncontradicted and unimpeached' and (2) 'of such a character and weight as to leave no room for a judicial determination that it was insufficient to support [the] finding.' [Citation.]" (*In re I.W.* (2009) 180 Cal.App.4th 1517, 1528) To prevail, Mother must show that the "undisputed facts lead to only one conclusion." (*Id.* at p. 1529; see also *In re A.A.* (2012) 203 Cal.App.4th 597, 612.) "The appropriate test for abuse of discretion is whether the trial court exceeded the bounds of reason. When two or more inferences can reasonably be deduced from the facts, the reviewing court has no authority to substitute its decision for that of the trial court." (*Shamblin v. Brattain* (1988) 44 Cal.3d 474, 478-479; see also *In re Stephanie M.*, *supra*, 7 Cal.4th at pp. 318-319.)

When a child is removed from a parent's custody, the current dependency scheme generally offers parents 12 months of reunification services, with a possibility of 6 additional months. (§ 361.5, subd. (a)(1).) The court must review the case every six months, and return the child to the parents unless it determines, by a preponderance of the evidence, that return of the child would create a substantial risk of detriment to the child's physical or emotional well-being. (§§ 361.5, subd. (b), 366, subd. (a)(1), 366.21, subds. (e) & (f), 366.22, subd. (a).) If the child may not safely be returned to

15

the parents within a maximum of 18 months from removal, the court must develop a permanent plan for the child.  (§ 366.22, subd. (a).)

There is an "'escape mechanism'" under section 388 for a parent to prove that his or her changed circumstances justify reinstitution of reunification services.  (*In re Marilyn H.* (1993) 5 Cal.4th 295, 309.)  To prevail, the parent must show both "a change of circumstances and that modification based on that change would be in the 'best interests' of the minor children."  (*In re Kimberly F* (1997) 56 Cal.App.4th 519, 526.)  Calculating the best interest of the child requires examining "the seriousness of the reason for the dependency in the first place," as well as the strength of the parental bond and "the degree to which the problem may be easily removed or ameliorated, and the degree to which it actually has been."  (*Id*. at pp. 530, 532.)

No party disputes that Mother has changed her circumstances for the better.  She had been sober for approximately a year at the time of the court's decision, was employed full time, involved in therapy and community work, and furthering her education.  The court's decision was based upon its concern that Mother's history of drug abuse presented too great of a risk to Minor's safety and need for stability.  Mother contends that the court abused its discretion in finding further reunification services were not in Minor's best interests, because its decision proceeded from false factual premises.

Mother's initial argument resolves into a contention that she was not a recidivist drug abuser because she had never really tried before to get clean.  She states that "Mother's *first* attempt at rehabilitation was made during Minor's case."  Mother states

16

that her two prior children were taken from her because her inventory job made it difficult for her to participate in the reunification plan. Unlike other cases involving multiple rehabilitation attempts and multiple relapses, Mother only failed at one rehabilitation attempt. She charges that the court incorrectly considered her as having a cyclical history of abuse and rehabilitation.

In addition, Mother charges that the court wrongly believed it was statutorily barred from offering further reunification services. She quotes the court's comment about the "'short period'" for a parent to follow through in efforts to reform in juvenile cases. This characterization of the court's reasoning is misplaced. The court never stated that there was an absolute statutory bar to proffering further services; had that been the reason, the court surely would have cited to statute in making its ruling. That comment and other similar statements such as those bemoaning the lack of the "luxury of time" concerned the need to give stability to an infant, who had been before the court almost her entire life, so that she would have a chance at an ordered life. The cases Mother cites such as *Bridget A. v. Superior Court* (2007) 148 Cal.App.4th 285, and *Mark N. v. Superior Court* (1996) 60 Cal.App.4th 996, established that there is no absolute bar to considering a section 388 petition at the 18-month mark; a contention not at issue here. The court heard Mother's petition and denied it on its merits.

Lastly, Mother argues that the court failed to properly analyze Minor's best interests. She points out that it is improper to compare socioeconomic advantages of the household of the adoptive family with that of the biological parent. (*In re Kimberly F.*, *supra*, 56 Cal.App.4th at pp. 529-530.) We find that no such weighing took place, and

17

Mother cites no such improper comparisons. The only references to the adoptive household appear in considering Minor's integration with the adoptive family and her acceptance of the adoptive parents as caretakers.[3] Mother also contends that the court placed too much reliance on the observations of the strength of the parental bond made by the social worker, who was not present at all the meetings with Minor and often was only present for part of the time. The social worker's report also relied on "second- and third-hand" observations. Mother further charges that the "conduct of [Minor's] foster father" all but ensured that Mother would not have quality visits with Minor. For her part, Mother asserts she has a "very positive, loving, and deep relationship" with Minor. She contends the court placed too little value on her biological ties to Minor and too much weight on irrelevant or unreliable impressions.

Mother's contention that she was improperly characterized as a cyclical drug abuser attacks the first prong of the section 388 analysis: she asserts that she really has changed because she has only failed rehabilitation once. The court, however, does not appear to have discounted her change of circumstances. It considered Mother's risk of returning to drug abuse as part of the second prong of section 388. The court decided Mother's past drug use exposed Minor to a future risk of neglect or abuse. The issue

---

[3] We note the "Preliminary Assessment of the Identified Prospective Adoptive Parent or Guardian," attached to the December 11, 2013, addendum report, contains passing references to the education, employment, and financial stability of the adoptive parents. There is no indication in the record that the court depended upon these factors in evaluating Minor's best interests.

was not whether Mother's sobriety was a real change, but whether Mother's prior failure to stay sober presented an unacceptable risk to the child.

Mother contrasts her situation with cases involving parents whose section 388 petitions were denied because they had not completed their recovery programs (*In re Casey D.* (1999) 70 Cal.App.4th 38, 45), and who had only been sober for 200 or 372 days since their latest relapse (*In re Cliffton B* (2001) 81 Cal.App.4th 415, 424; *In re Amber M.* (2002) 103 Cal.App.4th 681, 686). Mother believes her case stands in "sharp contrast" to those cases, noting that she had only relapsed once with Minor and there are no "early warning signs" that she will relapse again. Mother has made great strides, but she is incorrect to assert that her positive progress and year's sobriety provides uncontradicted and unimpeached assurances about her stability in the future, should Minor return to her care.

Mother is in recovery from addiction. That cannot ever be discounted, regardless of how bright the present may be. The most weighty consideration in evaluating the best interests of Minor is the fact Mother failed to heed those interests for her first two children, leaving them to fend for themselves while she indulged herself. Further, Mother exposed Minor to substantial risks in utero, whether or not she was using drugs, by smoking and neglecting prenatal care. Once Minor was born, Mother's behavior was unacceptable. There were suspicions Mother was under the influence while Minor was still in the hospital recovering from low birth weight; Parents were incommunicative and uncooperative with the Department through Minor's first weeks of life.

Despite her previous experience of losing custody of her daughters, Mother tested positive for amphetamine use just months after Minor's birth. Mother asserted the tests results were wrong, then failed to show for a succession of subsequent tests. Minor was removed from Mother's custody in March 2011.

Mother then appeared to reform. She participated in a wide array of services. She told a social worker she was "learning how to cope" with her addiction. Minor was returned to Mother in September 2011. Sobriety lasted perhaps into April. Mother tested positive again: another result that she asserted was a false positive due to prescription drugs. Nevertheless, she submitted to the court a panoply of certificates of completion from various programs and courses, as well as proof of enrollment into a MOMS program. The court ordered her services continued. She stopped attending her drug program. The next day she was a no-show for a drug test. She left her sober living home and became unreachable. Fearing Minor would be taken from her if she appeared, she allowed her welfare payments to lapse. Mother appeared in court after a protective custody warrant was issued for Minor. She had explanations for her disappearance, denied using drugs, and stated that she would be enrolling in a MOMS program that week. She then failed another drug test.

Mother's welfare benefits were restored, but she disappeared again. She contacted the Department on January 8 to say that she was living with her AA sponsor and that she would be enrolling in a MOMS program that week. The next day Mother's AA sponsor called the Department; she reported she had not seen Mother for nearly a

month.  Mother failed another drug test on January 25.  Minor was taken from Mother's custody on January 23, 2013.

Mother has had no positive drug tests since January 25.  She has taken responsibility for her drug use and admitted and apologized for lying to the court.  She has submitted to the court a panoply of certificates of completion from various programs and courses, as well as numerous letters of recommendation attesting to her good efforts.  In view of those positive signs, Mother discounts her past struggles with methamphetamine as having any significance in determining Minor's best interests.  She asserts it would be "a misconception of Mother's history" to think that her history of drug addiction could be a material factor in the court's calculus.

We disagree.  Mother has done everything asked of her since her last descent into abuse, but that does not settle the issue.  There is neither a rule stating that if you return to drug use while receiving reunifications services you must lose your children nor one mandating that full compliance with a reunification plan will restore your children to your custody.  The law allows and requires judicial officers to exercise their discretion in the best interests of the children.  Unless it is clear that no contrary conclusion could be reached but that it was in Minor's best interests to extend family reunification services so as to transition Minor back to Mother's care, we cannot overturn the court's decision.

Mother's contention that she has only relapsed once in her history is puzzling.  It is uncontested that Mother began using drugs over 30 years ago and has used methamphetamine since at least 2003.  She quit methamphetamine use in 2003 because

21

of an arrest. At that time, her first two children were approximately eight and twelve years old. She cared for those children until they were taken away from her in 2007 because of neglect caused by her drug abuse. At that time she was provided with services, which failed to prevent her from relapsing into drug abuse. Her children were permanently removed from her care in 2009.

Mother next tested positive for drugs shortly after Minor was born. Again, Mother was at risk of losing custody of a child, but was unable to resist drug use. Mother was again offered services, but again tested positive less than a month later. Extensive services were provided to Mother, but after approximately a year's sobriety she again tested positive. She completed an impressive amount of education and self-improvement courses, but shortly thereafter she left her sober living home and disappeared with Minor. Mother reappeared, protested her innocence, regained her welfare payments, and again tested positive for amphetamines. Mother characterizes this history as a single failure at rehabilitation.

Each failure is material in deciding whether Minor's best interests allowed the court to transition her back to Mother's care. Each time Mother falsely denied using drugs or made an empty promise to apply herself to her recovery or begin the MOMS program she lost credibility with the court. Her current year-long sobriety is a strong positive for her case, but so was her clean testing record after March 25, 2011, through April 16, 2012. Mother was able to raise her first two children for over a decade before she lost them to drug addiction. The court heard her testimony, reviewed her history, and weighed her credibility, then determined Minor's best interests lay with adoptive

parents. The court admitted that it was a difficult decision and there were competing considerations, including the priority given to family reunification. It is not the case, however, that the facts lead to only one outcome.

The risk that Mother may relapse is a major consideration in establishing Minor's best interests. "Family preservation ceases to be of overriding concern if a dependent child cannot be safely returned to parental custody." (*In re Lorenzo C.* (1997) 54 Cal.App.4th 1330, 1340.) No invalid structural considerations, such as incorrectly believing that the court was statutorily barred from further extending services beyond the 18-month limit, affected the court's decision. Likewise, the court did not misapply or neglect other considerations. There is no indication in the records that the court improperly contrasted the socioeconomic settings of the adoptive and biological placements or that it failed to weigh the strength of Mother's parental ties with Minor. The accusation of misbehavior or interference by the adoptive father lacks material support. The court's deliberation of Minor's best interests was proper and is supported by substantial evidence in the record. Mother needed to show the court that a preponderance of evidence supported her view that Minor's best interests required another attempt at reunification. The court reasonably decided that she did not do so. We see no abuse of discretion. (*In re Baby Boy H*. (1998) 63 Cal.App.4th 470, 474.)

B. <u>THE BONDING STUDY</u>

At the combined hearing on January 13, 2014, Mother offered to provide to the court, at her expense, a bonding study to determine whether the parental exception

23

under section 366.26, subdivision (c)(1)(a) or (b) should apply. The court declined to delay proceedings to allow the study to be conducted.

The decision whether to order a bonding study is left to the discretion of the court. A juvenile court's discretion to order a bonding study arises from Evidence Code section 730, which provides, in relevant part: "When it appears to the court, at any time before or during the trial of an action, that expert evidence is or may be required by the court or by any party to the action, the court on its own motion or on motion of any party may appoint one or more experts to investigate, to render a report as may be ordered by the court . . . ." There is no requirement that a court must conduct or allow a bonding study before terminating parental rights. (*In re Lorenzo C.*, *supra*, 54 Cal.App.4th at p. 1340.) A request made late in the process or close to the date of the 366.26 hearing is disfavored because of the delay it imposes. (*In re Richard C.* (1998) 68 Cal.App.4th 1191, 1197.) The Legislature did not contemplate such last-minute efforts to put off permanent placement. (*In re Marilyn H.*, *supra*, 5 Cal.4th at p. 310 ["lengthy and unnecessary delay in providing permanency for children [is] the very evil the Legislature intended to correct"].)

Mother asserts that the court should have resolved the conflict between (1) the evidence it had of her "positive and strong relationship" with Minor, and (2) the contrary information it had from the reports received from the Department through a bonding study. Mother notes that Minor had lived with her for almost half of Minor's

24

life.[4] She attacks the reliability of the observations and conclusions reached by the social worker's reports because they came from sporadic observation and relayed information, and were impliedly influenced by misbehavior by the adoptive father. She asserts that the need for the bonding study "did not become entirely clear until [the social worker] disclosed during her testimony that the foster father had been responsible for monitoring Mother's visits." Although she recognizes that timely resolution of this case is important, Mother asserts that unresolved questions about her relationship with Minor make the denial of her request to submit a bonding study an abuse of discretion.

In her briefing on this issue, Mother does not point to evidence supporting the existence of a bond with Minor. She did, however, cite to the Department reports elsewhere. When Minor was an infant, she "love[d] visiting" with Mother and would smile and make cute noises. She was described as "very bonded" to Parents in 2011 and 2012.

There were additional reports after Minor was removed from Mother's custody. Minor initially had trouble sleeping after being removed from Mother and wanted the foster mother to lie with her. In April 2013, Minor would sometimes cry when Mother's visits ended, but her sleeping problems went away. The next month Minor no longer cried when Mother left.

Minor became appropriately bonded with her prospective adoptive family. During a November 2013 visit, Minor turned away and "grabbed on" to the adoptive

---

[4] Minor had been in Mother's custody for approximately seven weeks after birth and then from September 2011 to January 2013.

father when Mother arrived. When the visit ended, Minor "just wave[d] goodbye and leaves." It took a while for Minor to "warm up" to Mother at the visits. The Department report stated Minor was "more upset when the prospective adoptive father leaves the visit room." At a December 2013 visit, Minor called Mother "mommy" and combed her hair. When the adoptive father left the room during that visit, Minor wanted to go with him. Other than her own characterizations of their relationship through testimony or statements to others, Mother provides no evidence of the bond outside of the cited reports.

Mother's evidence of her bond with Minor does not conflict with the Department reports; her evidence is derived from the Department reports. Mother's view that she remains very bonded to Minor is a possible interpretation of the evidence in the record. It is not the necessary interpretation, and it is not so incompatible with the court's conclusion as to make the decision not to accept a bonding study an abuse of discretion.

A contrary view of the evidence arises from considering the effect on Minor of having spent the majority of her life either outside of Mother's care or sharing her attention with Mother's addiction to drugs. Minor bonded to Mother as her earliest caretaker, but after they separated she transferred that bond to her foster family and then to the prospective adoptive parents. The record shows Minor growing less attached to and dependent upon Mother and more bonded to her adoptive family. Minor happily and fondly visits with Mother, but there does not appear to be a parental bond between them.

26

The court recognized the factors favoring Mother's interpretation. It noted that Minor called her "mom," but that she also used parental terms for the adoptive parents. The court recognized that no great weight could be put upon the terms used by such a young child. It noted that Mother's visits went well and were not terminated, "which is not always what we hear." After taking argument, the court declined to accept the bonding study. The court noted that the quality of the recent visits between Mother and Minor showed that a parental connection was not present.

Given the fact that the offer was made at the section 366.26 hearing and would entail significant delay, a higher showing of usefulness should be required before staying proceedings to allow the preparation and consideration of a bonding study. The court did not believe that a bonding study was necessary or would be helpful to the resolution of Minor's dependency. That decision is not clearly wrong or capricious, and is not an abuse of discretion.

C.     LEGAL GUARDIANSHIP

Mother asserts she demonstrated a compelling reason that a legal guardianship should have been established instead of adoption to allow her to regain custody of Minor. For the reasons set out above, we find Mother's history of drug addiction makes a placement with Mother too risky to be a compelling option.

27

An order terminating parental rights is reviewed under a substantial evidence standard. (*In re Jasmon O.* (1994) 8 Cal.4th 398, 422-423.)[5] In doing so, we do not reweigh the evidence or exercise our independent judgment. Rather, we review the evidence in the light most favorable to the judgment and decide if the evidence in support of the judgment is reasonable, credible and of solid value such that a reasonable trier of fact could find that termination of parental rights is appropriate based on clear and convincing evidence. (*Id.* at p. 423.) In applying this standard, "we draw all reasonable inferences in support of the findings, view the record [in the light] most favorabl[e] to the juvenile court's order, and affirm the order even if other evidence supports a contrary conclusion. [Citation.]" (*In re Megan S.* (2002) 104 Cal.App.4th 247, 251.)

If parents fail to reunify with an adoptable child, the juvenile court must terminate their parental rights and select adoption for the child's permanent plan unless the court finds that "a compelling reason for determining that termination [of parental rights] would be detrimental to the child" because, among other reasons, "[t]he parents have maintained regular visitation and contact with the child and the child would benefit from continuing the relationship." (§ 366.26, subd. (c)(1)(B)(i).) "To trigger the application of the parental relationship exception, the parent must show the parent-child relationship is sufficiently strong that the child would suffer detriment from its termination. [Citation.]" (*In re Aaliyah R.* (2006) 136 Cal.App.4th 437, 449.)

---

[5] Some courts have applied an abuse of discretion standard. (*In re Jasmine D.* (2000) 78 Cal.App.4th 1339, 1351.) Under either standard Mother's contention fails.

It is reasonably clear that Mother satisfied the first prong of the exception—she visited Minor consistently throughout the dependency.  Exceptions were so infrequent as to be unremarkable.  We therefore focus on the second prong, which "requires the parent to prove that 'severing the natural parent-child relationship would deprive the child of a *substantial*, positive emotional attachment such that the child would be *greatly* harmed.'"  (*In re Marcelo B.* (2012) 209 Cal.App.4th 635, 643.)  In *In re Autumn H.* (1994) 27 Cal.App.4th 567, the court listed factors that guide the juvenile court's determination of whether the exception should apply:  the age of the child, the portion of the child's life spent in the parent's custody, the effect of interaction between the parent and the child, and the child's particular needs.  (*Id.* at pp. 575-576.)

The *Autumn H.* factors support the court's decision.  Minor, who is now approximately three and one-half years old, was less than seven weeks old when she was removed, and has spent less than half her life in Mother's care.  As noted above, her interaction with Mother has been pleasant and fond, but a distance has arisen between them.  Her bond with Mother is not clearly stronger than the bond with her adoptive parents, and appears to have become significantly weaker.

Lastly, Minor's particular needs are for stability and safety in her life.  Mother's recent history is hopeful, and she shows promise of achieving real reform.  However, as the court noted, "mom has been here before."  Minor has twice been taken from Mother following relapses.  Minor is very young and thus very dependent upon a parent for her care and basic needs.  Mother has twice failed her, and Mother previously failed much older children.  Minor is young enough to make a new start with a new family with a

minimum of distress. "[D]elaying the selection of a permanent home for a child to see if a parent, who has repeatedly failed to reunify with the child, might be able to reunify at some future point, does not promote stability for the child or the child's best interests." (*In re Casey D.*, *supra*, 70 Cal App.4th at p. 47.) The balance of harms supports the termination of parental rights over the risks inherent in the maintenance of the possibility of a parental relationship through a legal guardianship.

Substantial evidence supports the court's decision. Mother has not shown that Minor would suffer from severance of Mother's parental rights so greatly that a legal guardianship should be established instead of proceeding with adoption. "'[C]hildhood does not wait for the parent to become adequate.'" (*In re Baby Boy L.* (1994) 24 Cal.App.4th 596, 610.) Mother's desire to reunite with Minor must give way to Minor's best interests.

### DISPOSITION

The judgment is affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

<u>MILLER</u>

J.

We concur:

<u>McKINSTER</u>

Acting P. J.

<u>CODRINGTON</u>

J.

30